**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| PATRICIA JAMES, derivatively on Behalf of herself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>PETER CUNEO, BARRY EMANUEL, DREW COHEN, MARK FRIEDMAN, JAMES MARCUM, SUE GOVE, NEIL COLE, WARREN CLAMEN, JEFF LUPINACCI, and DAVID BLUMBERG<br><br>Defendants,<br><br>-and-<br><br>ICONIX BRAND GROUP, INC.,<br><br>Nominal Defendant. | Civil Action No. 16-cv-02122<br><br><br>**JURY TRIAL DEMANDED** |

**VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT**

Plaintiff Patricia James ("Plaintiff"), by and through her undersigned counsel, alleges for her Verified Stockholder Derivative Complaint against defendants upon personal knowledge as to herself and her own acts, and as to all other matters upon information and belief based upon, *inter alia*, the investigation conducted by and through her attorneys, which included, among other things, a review and analysis of U.S. Securities and Exchange Commission ("SEC") filings by Iconix Brand Group, Inc. ("Iconix" or the "Company"), as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, and media reports about the Company.

## INTRODUCTION

1.     This is a stockholder derivative action asserting claims for breach of fiduciary duty brought on behalf of nominal defendant Iconix against certain officers and members of the Company's Board of Directors (the "Board").

2.     Iconix is a brand management company and owner of a diversified portfolio of global consumer brands across fashion, sports, entertainment, and home segments.  Iconix purports to specialize in marketing, merchandising, and licensing its brand portfolio, with over 1,100 licenses with retailers and manufacturers worldwide that sell across various distribution channels from the mass tier to the luxury market.

3.     The Company's business strategy is to maximize the value of its brands primarily through strategic licenses and joint venture partnerships around the world, as well as to grow the portfolio of brands through strategic acquisitions.

4.     The Company operates through an "asset-light" brand-management system geared toward generating revenue streams through the licensing of intellectual property rights without large outlays of cash for inventory or property, plant, and equipment.  Iconix typically purchases the licensing rights ("Licensing Rights") to an existing consumer fashion brand for a fixed acquisition cost (or cost basis), and licenses the right to use the brand through a series of agreements with various partners and joint ventures in exchange for licensing fees.

5.     During the relevant time period, the Individual Defendants (defined below) caused the Company to consistently report record revenue, earnings per share ("EPS"), and free cash flow results, with rapidly increasing equity earnings on joint venture investments, on a quarter-over-quarter basis.  Unbeknownst to investors, however, the Company had violated the federal securities laws by underreporting the cost basis of certain Licensing Rights acquisitions and engaging in irregular accounting practices related to the booking of its joint venture revenues

and profits, free-cash flow, and organic growth.  As a result of the deceptive accounting practices that flourished due to the Individual Defendants' breaches of fiduciary duty, as described herein, the Company overstated its financial results and performance, causing Iconix's securities to trade at artificially inflated prices, reaching a relevant period high closing price of $44.22 per share on June 9, 2014.

6.     The true state of the Company's specious accounting practices was revealed through a series of partial disclosures and conspicuously-timed executive resignations.  On December 14, 2014, *Off Wall Street* published a research note initiating a "sell" recommendation on Iconix shares citing organic sales declines in core portfolio brands and "questionable" accounting practices.

7.     On this news, Iconix's stock price dropped $2.39 per share, or over 6%, to close at $36.86 per share on December 15, 2014.

8.     On March 30, 2015, after the close of trading, the Company filed a Form 8-K with the SEC announcing that its Chief Financial Officer ("CFO"), Jeff Lupinacci ("Lupinacci"), had resigned effective March 30, 2015.  The Company stated in relevant part:

> On March 24, 2015, Jeff Lupinacci, the Chief Financial Officer of Iconix Brand Group, Inc. (the "Company") notified the Company of his intention to resign, with 60 days' notice, to pursue another business opportunity.  The Company has determined to make such resignation effective March 30, 2015.  The Company has commenced a search for Mr. Lupinacci's replacement and anticipates filling the position in the near term.

9.     On this news, Iconix's stock price dropped $2.72 per share, or nearly 7.5%, to close at $33.67 per share on March 31, 2015.

10.    On April 13, 2015, the first in a series of three articles about Iconix was published on the investor news site *Seeking Alpha*.  The article alleged that the Company's revenue and

earnings growth has been driven by increasing sales of assets and "non-cash gains" from book value adjustments and that operating cash flow was declining.

11.     On April 15, 2015, just before the market closed, a second article about Iconix was published on *Seeking Alpha*, alleging that the Company was overstating its organic growth rate.

12.     On this news, Iconix shares declined $1.27 per share from $33.30 per share on April 15, 2015, to close on April 17, 2015 at $32.03 per share, a two-day decline of nearly 4%.

13.     On April 17, 2015, near the end of the trading day, *Seeking Alpha* published the third and final article about Iconix, alleging in detail how the majority of the Company's brands have diminished in value since Iconix acquired them.

14.     Additionally, on April 17, 2015, after the market closed, Iconix announced that the Company's Chief Operating Officer ("COO") had resigned after only serving for approximately one year.  The Company stated that it did not intend to name a new COO.

15.     Thereafter, on April 20, 2015, Roth Capital Partners published an Equity Research Note titled, "ICON: COO Departure Creates Greater Uncertainty; Lowering Target To $36."  The Note discussed certain accounting uncertainties surrounding the Company's prior reporting of free cash flow and practice of booking joint venture gains as revenue.

16.     On these disclosures, Iconix shares declined $6.62 per share, or over 20%, to close at $25.41 per share on April 20, 2015.

17.     Thereafter, on August 6, 2015, after the close of trading, the Company announced in a press release that its founder and Chief Executive Officer ("CEO"), Neil Cole ("Cole"), had resigned effective immediately.  According to the press release, Cole served as the Company's CEO, Chairman, and President since he founded Iconix in 2005.

18.     On this news, Iconix shares declined $4.68 per share, or nearly 24%, to close at $14.92 per share on August 7, 2015.

19.     Finally, on August 10, 2015, prior to the market open, Iconix released disappointing results for the second quarter ended June 30, 2015 and drastically cut its full year sales guidance.   Specifically, quarterly revenues missed consensus estimates by 14%, and quarterly earnings missed by 13%.

20.     In connection with its results, Iconix also reported that the SEC had commenced an inquiry into the Company's accounting for joint venture transactions.   In an accompanying press release, the Company disclosed that the SEC was reviewing its "accounting treatment for the formation of the Company's international joint ventures under U.S. Generally Accepted Accounting Principles and whether such joint ventures should potentially have been consolidated in the Company's historical results." Iconix also revealed that its Board had formed an independent committee to review this questionable accounting.   The Company warned that it may ultimately be forced to reverse certain gains it had recognized on its historical joint venture transactions and that the specific amounts that could be reversed as a result of improper accounting were estimated to be $46.5 million in 2014, $24.6 million in 2013, and $5.6 million in 2012.

21.     In response to these revelations, Iconix shares declined $0.35 per share, or 2.3%, to close at $14.57 per share on August 10, 2015.

22.     As a result of the Individual Defendants' breaches of fiduciary duty as described herein, they caused or allowed the Company to:

        (a)     underreport the cost basis of the Licensing Rights to certain brands;

(b)     engage in irregular accounting practices related to the booking of its joint venture revenues and profits, free-cash flow, and organic growth;

(c)     overstate earnings and revenues; and

(d)     release statements about the Company's business, operations, and future business prospects that were materially false and misleading and/or lacked a reasonable basis.

23.     As the truth about Iconix's accounting practices was gradually revealed to investors, the Company's share price declined dramatically.  Iconix and certain of its officers are now defendants in a federal securities class action brought on behalf of all persons or entities who purchased or otherwise acquired the publicly-traded securities of Iconix between February 20, 2013 and August 7, 2015, inclusive, seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

24.     Additionally, the Company is the subject of a formal inquiry by the SEC.

## JURISDICTION AND VENUE

25.     This Court has jurisdiction over all claims asserted herein pursuant to 28 U.S.C. § 1332(a)(2) because complete diversity exists between Plaintiff and each defendant and the amount in controversy exceeds $75,000.  This is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

26.     This Court has jurisdiction over each named defendant herein because each defendant is either a corporation that conducts business in this District, or is an individual who has sufficient minimum contact with New York so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

27.     The claims asserted herein arise under and pursuant to 28 U.S.C. § 1391(a) because one or more of the defendants either resides in or maintains executive offices in this District, a substantial portion of the transactions and wrongs complained of herein, including

defendants' primary participation in the wrongful acts detailed herein and aiding and abetting in violation of duties owed to Iconix occurred in this District, and defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that have an effect in this District.

28.     Venue is proper in this District because Iconix, the nominal party on whose behalf this action is brought, maintains its principal executive offices in this District.  Additionally, venue is proper in this District because a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, occurred in this District, and the relevant documents and sources of proof relevant to this action are located in this District.

## PARTIES

29.     Plaintiff is a stockholder of Iconix, was a stockholder of Iconix at the time of the wrongdoing alleged herein, and has been a stockholder of Iconix continuously since that time. Plaintiff is a citizen of California.

30.     Nominal Defendant Iconix is a Delaware corporation with its principal executive offices located at 1450 Broadway, New York, New York 10018.  The Company's stock is listed on the NASDAQ Global Select Market ("NASDAQ") under the symbol "ICON."

31.     Defendant Peter Cuneo ("Cuneo") has served as Chairman of the Board and Interim CEO since August 2015, and has served on the Board since October 2006.  Cuneo also served as Chairman of the Audit Committee from 2013 until his appointment as Interim CEO on August 6, 2015.  In 2013 and 2014, Iconix paid Cuneo $195,000 and $205,000, respectively, in director compensation.  Upon information and belief, Cuneo is a citizen of Connecticut.

32.      Defendant Barry Emanuel ("Emanuel") has served on the Board since May 1993. In 2013 and 2014, Iconix paid Emanuel $170,000 and $180,000, respectively, in director compensation.  Upon information and belief, Emanuel is a citizen of New York.

33.      Defendant Drew Cohen ("Cohen") has served on the Board since April 2004 and has served as the Lead Director since August 2015.  Cohen has served on the Audit Committee since 2013.   In 2013 and 2014, Iconix paid Cohen $190,000 and $195,000, respectively, in director compensation.  Upon information and belief, Cohen is a citizen of New York.

34.       Defendant Mark Friedman ("Friedman") has served on the Board since October 2006.  In 2013 and 2014, Iconix paid Friedman $190,000 and $200,000, respectively, in director compensation.  Upon information and belief, Friedman is a citizen of New York.

35.      Defendant James A. Marcum ("Marcum") has served on the Board since October 2007.  Marcum has served on the Audit Committee since 2013 and is designated by the Board as an Audit Committee Financial Expert.   In 2013 and 2014, Iconix paid Marcum $170,000 and $180,000, respectively, in director compensation.   Upon information and belief, Marcum is a citizen of Massachusetts.

36.      Defendant Sue Gove has served on the Board since October 2014.  Gove has been a member and Chairperson of the Audit Committee since October 2014 and is designated by the Board as an Audit Committee Financial Expert.  Upon information and belief, Gove is a citizen of Texas.

37.      Defendant Cole was, at all relevant times, CEO, Chairman, President, and a member of the Board, until his resignation on August 6, 2015.  In 2013 and 2014, Iconix paid Cole $3,734,354 and $2,678,628, respectively, in compensation.  Upon information and belief, Cole is a citizen of New York.

38.     Defendant Warren Clamen ("Clamen") was CFO of Iconix until his resignation on March 18, 2014.   In 2013 and 2014, Iconix paid Clamen $1,765,005 and $167,292, respectively, in compensation.  Upon information and belief, Clamen is a citizen of New York.

39.     Defendant Lupinacci was CFO of Iconix from April 7, 2014 until his resignation on March 30, 2015.  Upon information and belief, Lupinacci is a citizen of New York.

40.     Defendant David Blumberg ("Blumberg") has served as a Executive Vice President – Head of Strategic Development and Interim CFO since March 30, 2015.  In 2013 and 2014 Iconix paid Blumberg $7,118,000 and $1,165,876, respectively, in compensation.  Upon information and belief, Blumberg is a citizen of New York.

41.     The individuals listed in ¶¶ 31-40 are collectively referred to herein as the "Individual Defendants."   Together with Iconix, the Individual Defendants are sometimes referred to herein as "Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

42.     By reason of their positions as officers and/or directors of the Company and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed the Company and its stockholders the fiduciary obligations of good faith, loyalty, and candor and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its stockholders so as to benefit all stockholders equally and not in furtherance of their personal interest or benefit.  Each director and officer of the Company owes to the Company and its stockholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.  The Individual Defendants, because of their positions of control and

authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

43.     To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the Company.  By virtue of such duties, the officers and directors of Iconix were required to, among other things:

a)     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

b)     conduct the affairs of the Company in a lawful, efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

c)     properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results and prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

d)     remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws; and

e)     ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state, and local laws, rules, and regulations.

44.     The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its stockholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

45.     Iconix's Code of Business Conduct and Ethics further articulates the directors' responsibilities and states, in part, as follows:

**6.     Accurate Books and Records**

The law requires the Corporation to make sure that its books and records accurately and fairly represent transactions and dispositions of our assets in reasonable detail.  In all of our operations, it is a violation of Corporation policy, and possibly illegal, for any of us to cause our books and records to be inaccurate in any way.  You must never create or participate in the creation of records that are misleading or artificial.  If you are asked to falsify the accounting records in any manner or are aware of falsification by anyone else in the Corporation, you should immediately report the event to the Corporation's General Counsel.

You are expected to cooperate fully with our internal and independent auditors. In particular, the following requirements must be strictly respected by all of us.

A.     Access   to   Corporation   Assets,   Transactions   on   Management's Authorization

Access to Corporation assets is permitted only in accordance with management's general or specific authorization and transactions must be executed only in accordance with management's general or specific authorization.  Transactions involving the Corporation must be recorded to permit preparation of our financial statements in conformity with generally accepted accounting principles and related requirements and to maintain accountability for the Corporation's assets.

B.     Accurate Books

All Corporation books and records must be true and complete.  False or misleading entries are strictly prohibited, and the Corporation will not condone any undisclosed liabilities or unrecorded bank accounts or assets established for any purpose.

*       *       *

D.       Appropriate Controls

Administrative and accounting controls must be implemented to provide reasonable assurance that the Corporation is in compliance with the above requirements and that financial reports are accurately and reliably prepared, and fully and fairly disclose all required or otherwise material information.

46.      The Individual Defendants that also serve as members of the Audit Committee have further responsibilities and duties as set forth in the Audit Committee Charter.   In particular, the Audit Committee Charter describes those duties and responsibilities, as follows:

Review and discuss with the outside auditors for the Company the following:

(i)      All critical accounting policies and practices to be utilized in connection with the preparation of the Company's financial statements;

(ii)     All alternative treatments of financial information within generally accepted accounting principles that have been discussed with the management of the Company, ramifications of the use of such alternative disclosures and treatments, and the treatment preferred by the outside auditors; and

(iii)    All material written communications between the outside auditors and the management of the Company, such as any management letter or schedule of unadjusted differences.

Review and discuss with the Chief Executive Officer and the Chief Financial Officer of the Company making certifications in each of the Company's annual and quarterly reports filed with the SEC the following:

(iv)     Any significant deficiencies in the design or operation of internal controls which could adversely affect the Company's ability to record, process, summarize, and report financial data, as well as any material weaknesses in the Company's internal controls; and

(v)      Any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal controls.

*        *        *

Review the Company's Forms 10-Q and 10-K prior to filing with the SEC.

Review and discuss with management the Company's earnings press releases, including the use of "pro forma" or "adjusted" non-GAAP information, as well as financial information and earnings guidance provided to analysts and ratings

agencies. Such discussion may be done generally (consisting of discussing the types of information to be disclosed and the types of presentations to be made.

47.     The Individual Defendants failed to carry out their duties as set forth above resulting in the breaches of fiduciary duty described herein.

## **BACKGROUND**

48.     Iconix is a brand management company and owner of a diversified portfolio of 35 global consumer brands across women's, men's, entertainment, and home. The Company's business strategy is to maximize the value of its brands primarily through strategic licenses and joint venture partnerships around the world, as well as to grow the portfolio of brands through strategic acquisitions.

49.     The Company's brand portfolio includes Candie's®, Bongo®, Badgley Mischka®, Joe Boxer®, Rampage®, Mudd®, London Fog®, Mossimo®, Ocean Pacific/OP®, Danskin/Danskin Now®, Rocawear® /Roc Nation®, Cannon®, Royal Velvet®, Fieldcrest®, Charisma®, Starter®, Waverly®, Ecko Unltd® /Mark Ecko Cut & Sew®, Zoo York®, Sharper Image®, Umbro®, StrawBerry Shortcake®, PONY® and Lee Cooper®; and interests in Artful Dodger®, Material Girl®, Peanuts®, Ed Hardy®, Truth or Dare®, Modern Amusement®, Buffalo®, Nick Graham® and Hydraulic®.

50.     The Company looks to monetize the Intellectual Property ("IP") related to its Licensing Rights of brands throughout the world and in all relevant categories through various methods, including:  (i) licensing directly with leading retailers; (ii) consortia of wholesale licensees; (iii) joint ventures in specific territories; and (iv) "Other" activity such as corporate sponsorships and content, and the sale of IP Licensing Rights for specific categories or territories.

51.     Products bearing the Company's brands are sold across a variety of distribution channels from the mass tier to the luxury market.  The licensees are responsible for designing, manufacturing and distributing the licensed products.  The Company supports its brands with advertising and promotional campaigns designed to increase brand awareness.  Additionally the Company provides its licensees with coordinated trend direction to enhance product appeal and help build and maintain brand integrity.

52.     Globally, the Company has over 50 direct-to-retail licenses and more than 1,100 total Licensing Rights.  The Company's Licensing Rights typically require the licensee to pay the Company royalties based upon net sales with guaranteed minimum royalties in the event that net sales do not reach certain specified targets.  As of January 1, 2015, the Company purportedly had over $800 million of aggregate guaranteed royalty revenue over the terms of its existing contracts excluding renewals.

53.     A key initiative in the Company's global brand expansion plans has been the formation of international joint ventures.  The Company's primary purpose in forming international joint ventures is to bring its brands to market more quickly and efficiently, generating greater short- and long-term value from its IP than the Company believes is possible if it were to build-out wholly-owned operations on its own across a multitude of regional or local offices.  Through December 31, 2014, the Company formed the following joint ventures to develop and market its brands in specific international markets:

| Date Created | Investment /Joint Venture | Iconix's Interest |
|---|---|---|
| September 2008 | Iconix China | 50% |
| December 2009 | Iconix Europe(1) | 51% |
| May 2012 | Iconix India | 50% |
| June 2013 | Iconix Canada | 50% |
| September 2013 | Iconix Australia | 50% |
| October 2013 | Iconix Southeast Asia | 50% |

14

| December 2013 | Iconix Israel | 50% |
| December 2014 | Iconix Middle East | 50% |

54.     According to Iconix, the formation and administration of the international joint ventures have been a central and ongoing component of the Company's business since 2008.

55.     Additionally, the Company's goal of maximizing the value of its IP also includes the sale to third parties of a brand's Licensing Rights in specific territories or categories. Accordingly, the Company evaluates potential offers to acquire some or all of a brand's IP by comparing whether the offer is more valuable than the Company's estimate of the current and potential revenue streams to be earned via the Company's traditional licensing model.

### THE MATERIALLY FALSE AND MISLEADING STATEMENTS

56.     The relevant time period begins on February 20, 2013, when Iconix issued a press release announcing its financial results for the fourth quarter ("Q4") and fiscal year ("FY") ended December 31, 2012.  Therein, the Company announced Q4 and FY 2012 revenue of $85.1 million and $353.8 million, respectively; Q4 and FY 2012 non-GAAP diluted EPS of $0.41 and $1.70, respectively; and Q4 and FY 2012 free cash flow of $37.9 million and $180.5 million, respectively.   Additionally, the Company reported equity earnings on joint ventures of approximately $6.7 million for Q4 and $10.9 million for FY 2012.  CEO Cole commented on the Company's performance, stating in part:

> Over the past year we have executed on several exciting initiatives that position our company for significant growth.  We acquired three iconic brands, continued to expand our global footprint, signed a Peanuts movie deal and launched a new $1.1 billion securitization facility.  ***Looking to 2013 and beyond, with our powerful portfolio of over 30 brands that are well diversified across numerous industries and geographies along with our strong balance sheet and financial flexibility, we look forward to delivering continued growth and value to our shareholders.***

57.     On February 28, 2013, Iconix filed its Annual Report with the SEC on Form 10-K for the 2012 fiscal year.  The Company's Form 10-K was signed by defendants Cole and

Clamen, and reaffirmed the Company's February 20, 2013 statements.   The Form 10-K also contained certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), signed by defendants Cole and Clamen, who certified the following:

1.      I have reviewed this Annual Report on Form 10-K for the period ended December 31, 2012 of Iconix Brand Group, Inc.;

2.      Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.      Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.      The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a)      Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b)      Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c)      Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and;

d)      Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.      The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a)      All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b)      Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

58.     On April 24, 2013, Iconix issued a press release announcing its financial results for the first quarter ended March 31, 2013.  Therein, the Company announced record Q1 revenue of $105.1 million, a 19% increase over the prior year quarter; record Q1 non-GAAP diluted EPS of $0.54, a 26% increase over the prior year quarter; and record Q1 free cash flow of $51.8 million and EBITDA of $64.6 million.  Additionally, the Company reported equity earnings on joint ventures of approximately $2 million.   CEO Cole commented on the Company's performance, stating in part:

> With record results in the first quarter, 2013 is off to a strong start and we are on track to deliver over 20% revenue and EPS growth for the full year.   We successfully completed three acquisitions in the past five months and with our current pipeline we believe there are additional opportunities, which would continue to enhance our portfolio.  ***As we look ahead, we are also focused on continuing to build our portfolio of brands organically through our global platform, and we believe that with our free cash flow and strong balance sheet we will continue to create increased shareholder value.***

59.     On May 7, 2013, Iconix filed its Quarterly Report on Form 10-Q for the first quarter of 2013.  The Company's Form 10-Q was signed by defendants Cole and Clamen, and reaffirmed the Company's April 24, 2013 statements.   The Form 10-Q also contained certifications signed by defendants Cole and Clamen pursuant to SOX substantially similar in all material respects to those set forth in ¶ 57, *supra*.

60.     On July 24, 2013, the Individual Defendants caused Iconix to issue a press release announcing its financial results for the second quarter ended June 30, 2013.  Therein, the Company announced record Q2 revenue of $115.1 million compared to $93.6 million in the prior year quarter, a 23% increase; record Q2 non-GAAP diluted EPS of $0.72 compared to $0.45 in the prior year quarter, a 60% increase; and free cash flow for the second quarter of approximately $60.8 million, a 17% increase as compared to the prior year quarter. Additionally, the Company reported equity earnings on joint ventures of approximately $2.3 million.  The press release also announced the formation of Iconix's new Canadian joint venture, stating:  "Included in the second quarter and year-to-date results ended June 30, 2013, is the formation of a new joint venture in Canada, which contributed approximately $9.8 million to revenue."

61.     On August 9, 2013, the Individual Defendants caused Iconix to file its Quarterly Report on Form 10-Q for the 2013 fiscal second quarter.  The Company's Form 10-Q was signed by defendants Cole and Clamen, and reaffirmed the Company's July 24, 2013 statements.  The Form 10-Q also contained certifications signed by defendants Cole and Clamen pursuant to SOX substantially similar in all material respects to those set forth in ¶ 57, *supra*.

62.     On October 29, 2013, Iconix issued a press release announcing its financial results for the third quarter ended September 30, 2013.  Therein, the Company announced record Q3 revenue of $107.2 million compared to $86.6 million in the prior year quarter, a 24% increase; record Q3 non-GAAP diluted EPS of $0.59 compared to $0.41 in the prior year quarter, a 44% increase; and free cash flow for the third quarter of approximately $54.3 million, a 26% increase as compared to the prior year quarter.  Additionally, the Company reported equity earnings on joint ventures of approximately $3.4 million.  The press release also announced the formation of

Iconix's new Australian joint venture, stating:  "Included in the third quarter and year-to-date results, is the formation of a new joint venture in Australia, which contributed approximately $5 million to revenue."

63.    On November 6, 2013, Iconix filed its Quarterly Report on Form 10-Q for the 2013 fiscal third quarter.  The Company's Form 10-Q was signed by defendants Cole and Clamen, and reaffirmed the Company's October 29, 2013 statements.  The Form 10-Q also contained certifications signed by defendants Cole and Clamen pursuant to SOX substantially similar in all material respects to those set forth in ¶ 57, *supra*.

64.    On February 20, 2014, Iconix issued a press release announcing its financial results for the fourth quarter and fiscal year ended December 31, 2013.  For the fourth quarter, the Company announced record Q4 revenue of $105.3 million, a 24% increase over the prior year quarter; record Q4 non-GAAP diluted EPS of $0.54, a 32% increase over the prior year quarter; and record Q4 free cash flow of $62.9 million, a 66% increase over the prior year quarter.  For the year, the Company announced record 2013 revenue of $432.6 million, a 22% increase over the prior year; record 2013 non-GAAP diluted EPS of $2.39, a 41% increase over the prior year; and record 2013 free cash flow of $229.9 million, a 27% increase over the prior year.  Additionally, the Company reported equity earnings on joint ventures of approximately $4.5 million for Q4 and $12.1 million for FY 2013.  CEO Cole commented on the Company's performance, stating in part:

> Since converting to a licensing model in 2005, we have built a powerful global platform, delivering compounded annual growth of around 40% for both revenue and EPS.  ***In 2013, we had another record year and continued to drive growth through the expansion of our worldwide footprint, our acquisition strategy of asset light businesses and global brands, and our ongoing commitment to share repurchases.  Looking ahead, as we continue to focus on international markets and additional acquisitions, I believe we can build on our success and continue to deliver increased value to our shareholders.***

65.     On February 27, 2014, the Individual Defendants caused Iconix to file its Annual Report on Form 10-K for the 2013 fiscal year.  The Company's Form 10-K was signed by defendants Cole and Clamen, and reaffirmed the Company's February 20, 2014 statements.  The Form 10-K also contained certifications signed by defendants Cole and Clamen pursuant to SOX substantially similar in all material respects to those set forth in ¶ 57, *supra*.

66.     On March 19, 2014, the Company announced in a press release that defendant Clamen was resigning from the Company as CFO, effective immediately.  According to the press release, the Company promoted Seth Horowitz to Chief Operating Officer, and Jeff Lupinacci to CFO.

67.     On April 30, 2014, Iconix issued a press release announcing its financial results for the first quarter ended March 31, 2014.  Therein, the Company announced record Q1 revenue of $116.1 million, an 11% increase over the prior year quarter; record Q1 non-GAAP diluted EPS of $0.72, a 33% increase over the prior year quarter; and record free cash flow of $58.0 million, a 12% increase over the prior year quarter.  Additionally, the Company reported equity earnings on joint ventures of approximately $3.1 million.  CEO Cole commented on the Company's performance, stating in part:

> With record results in the first quarter, 2014 is off to a strong start.  ***Through our diversified portfolio of brands and expanding global footprint we continued to achieve strong growth***.  As we look ahead, we believe we can continue to deliver significant value to our Company and shareholders through a combination of organic growth driven by international expansion and Peanuts initiatives, as well as, additional acquisitions of global iconic brands.

68.     On May 9, 2014, the Individual Defendants caused Iconix to file its Quarterly Report on Form 10-Q for the 2014 fiscal first quarter.  The Company's Form 10-Q was signed by defendants Cole and Lupinacci, and reaffirmed the Company's April 30, 2014 statements.  The

Form 10-Q also contained certifications signed by defendants Cole and Lupinacci pursuant to SOX substantially similar in all material respects to those set forth in ¶ 57, *supra*.

69.     On July 29, 2014, Iconix issued a press release announcing its financial results for the second quarter ended June 30, 2014.  Therein, the Company announced record Q2 revenue of $118.9 million and non-GAAP diluted EPS of $0.75; record Q2 EBITDA of $78.2 million and Q2 EBITDA margin of 66%; and free cash flow for the second quarter of $60.0 million for Q2 and $118.0 million for the six month period.  Additionally, the Company reported equity earnings on joint ventures of approximately $5.7 million.  CEO Cole commented on the Company's performance, stating in part:

> **With record results in the second quarter, we continue to demonstrate the power of our business model with our diversified revenue stream and strong free cash flow**.  As we look to the future we believe we can continue to deliver significant growth and increased value for our Company and shareholders through our global expansion plans, worldwide Peanuts business and additional acquisitions of global iconic brands.

70.     On August 6, 2014, Iconix filed its Quarterly Report on Form 10-Q for the 2014 fiscal second quarter.  The Company's Form 10-Q was signed by defendants Cole and Lupinacci, and reaffirmed the Company's July 29, 2014 statements. The Form 10-Q also contained certifications signed by defendants Cole and Lupinacci pursuant to SOX substantially similar in all material respects to those set forth in ¶ 57, *supra*.

71.     On October 28, 2014, Iconix issued a press release announcing its financial results for the third quarter ended September 30, 2014.  Therein, the Company announced record Q3 revenue of $113.8 million, a 6% increase over the prior year quarter; record Q3 diluted non-GAAP EPS of $0.73, a 23% increase over the prior year quarter; and free cash flow of $61.8 million, a 14% increase as compared to the prior year quarter.  Additionally, the Company

reported equity earnings on joint ventures of approximately $4.1 million.  CEO Cole commented

on the Company's performance, stating in part:

> ***Our strong third quarter and year to date results reflect the continued strength
> of our overall portfolio and the power of our business model.  With solid brand
> performance domestically supported by large direct-to-retail licenses, and
> double digit growth around the world driven by our global brands and joint
> ventures, we continue to execute in line with our successful track record***.  As we
> look to 2015, we expect to continue to drive positive organic growth, and with our
> strong balance sheet we plan to deliver additional value as we execute on our
> acquisition strategy and continue to opportunistically repurchase stock.

72.     On November 7, 2014, the Individual Defendants caused Iconix to file its

Quarterly Report on Form 10-Q for the 2014 fiscal third quarter.  The Company's Form 10-Q

was signed by defendants Cole and Lupinacci, and reaffirmed the Company's October 28, 2014

statements.   The Form 10-Q also contained certifications signed by defendants Cole and

Lupinacci pursuant to SOX substantially similar in all material respects to those set forth in ¶ 57,

*supra*.

## The Accounting Improprieties Are Slowly Revealed

73.     On December 14, 2014, *Off Wall Street* published a research note initiating a

"sell" recommendation on Iconix shares citing organic sales declines in core portfolio brands and

"questionable" accounting practices.

74.     On this news, Iconix's share price declined $2.39 per share, or over 6%, to close

at $36.86 per share on December 15, 2014.

75.     On February 26, 2015, Iconix issued a press release announcing its financial

results for the fourth quarter and fiscal year ended December 31, 2014.  For the fourth quarter,

the Company announced total revenue of $112.4 million, a 7% increase over the prior year

quarter; diluted non GAAP EPS of $0.56, a 4% increase over the prior year quarter; and free

cash flow of approximately $46.3 million for the quarter, a 19% decrease as compared to the

prior year quarter.   For the year, the Company announced revenue of $461.2 million, a 7% increase over the prior year; diluted non GAAP EPS of $2.78, a 16% increase over the prior year; and free cash flow of approximately $174.3 million, a 26% decrease as compared to the prior year.   Additionally, the Company reported equity earnings on joint ventures of approximately $4.15 million for Q4 and $17 million for FY 2014.   In connection with the formation of joint ventures and sale of certain trademarks, the Company generated approximately $51.2 million of notes receivable in 2014 as compared to approximately $15.8 million in 2013.

76.     Critically, the press release indicated that the Company had "revised" the free cash flow presentation for the quarter and fiscal year due because "[t]he increased number of joint venture transactions in 2014 has led to an increase in the receivable component of the Company's previous free cash flow calculation.   The revised free cash flow calculation includes only cash received in the period."

77.     On March 2, 2015, the Individual Defendants caused Iconix to file its Annual Report on Form 10-K for the 2014 fiscal year.   The Company's Form 10-K was signed by defendants Cole and Lupinacci, and reaffirmed the Company's February 26, 2015 statements. The Form 10-K also contained certifications signed by defendants Cole and Lupinacci pursuant to SOX substantially similar in all material respects to those set forth in ¶ 57, *supra*.

78.     On March 30, 2015 after the close of trading, the Company filed a Form 8-K announcing that its CFO, Lupinacci, had resigned effective March 30, 2015. The Company stated in relevant part:

> On March 24, 2015, Jeff Lupinacci, the Chief Financial Officer of Iconix Brand Group, Inc. (the "Company") notified the Company of his intention to resign, with 60 days' notice, to pursue another business opportunity.   The Company has determined to make such resignation effective March 30, 2015.   The Company

has commenced a search for Mr. Lupinacci's replacement and anticipates filling the position in the near term.

79.     On this news, Iconix shares declined $2.72 per share, or nearly 7.5%, to close at $33.67 per share on March 31, 2015.

80.     On April 13, 2015, the first in a series of three articles about Iconix was published on the investor news site *Seeking Alpha*, entitled, "Iconix Brand Group Part 1:  The Growth In Revenue And Earnings Was Driven By Increasing Sales Of Assets And Non-Cash Gains."  The article stated, in relevant part:

- Recent correction of past cash flow statements revealed a declining operating cash flow.

- The growth in revenue and earnings in the past years was driven by increasing sale of asset and "non-cash gain" from book value adjustment.

- The amount of "gain" from brand sale is determined by the cost basis assignment, which was under-reported with questionable accounting practices, especially when joint venture was formed.

- Non-cash gain was realized through a re-measurement of book value, despite a net capital loss.

81.     On April 15, 2015, just before the market closed, *Seeking Alpha* published the second article in the series, entitled "Iconix Brand Group Part 2:  The Diminishing Earnings Power Of Iconix Brands."  Despite the Company's aggressive acquisitions and increasing leverage, the article provided quantitative evidence that the real earnings power of Iconix brands has been diminishing, with negative growth rates of licensing revenue, earnings, licensing return, gross retail sales, among others.

82.     On this news, Iconix shares declined $1.27 per share from $33.30 per share on April 15, 2015, to close on April 17, 2015 at $32.03 per share, a two-day decline of nearly 4%.

83.     On April 17, 2015, near the end of the trading day, *Seeking Alpha* published the third and final article about Iconix, alleging in detail how the majority of the Company's brands have diminished in value since Iconix acquired them.

84.     Additionally, on April 17, 2015, after the market closed, Iconix filed a Form 8-K announcing that the Company's COO had resigned after only serving for approximately one year.  The Company stated, in relevant part:

> Seth Horowitz, Chief Operating Officer ("COO") of Iconix Brand Group, Inc. (the "Company"), tendered his resignation on April 13, 2015.  Mr. Horowitz served as COO for approximately one year.  The Company does not intend to seek a new COO at this time.  Mr. Horowitz's responsibilities are now being assumed by the broader Iconix team.

85.     Thereafter, on April 20, 2015, Roth Capital Partners published an Equity Research Note titled, "ICON:  COO Departure Creates Greater Uncertainty; Lowering Target To $36."  The Note stated, in relevant part:

> News of the Coo's resignation is likely to weigh on shares near-term, particularly following the CFO's recent departure as well as uncertainties surrounding the company's prior reporting of free cash flow and practice of booking joint venture gains as revenue.
>
> *         *         *
>
> **Increasing Uncertainty.**  This announcement follows the March 30 resignation of chief financial officer, Jeff Lupinacci, who will pursue another business opportunity.  While not necessarily connected, Lupinacci's departure came after uncertainties surrounding the company's reporting of free cash flow.

86.     On these disclosures, Iconix shares declined $6.62 per share, or nearly 21%, to close at $25.41 per share on April 20, 2015.

87.     With the suspicion of accounting improprieties swirling in the market, cracks in the façade began to appear in the Company's reported results.  On April 29, 2015, Iconix issued a press release announcing its financial results for the first quarter ended March 31, 2014.  Therein, the Company announced Q1 licensing revenue of $95.4 million, a 15% decrease

compared to approximately $112.2 million in the first quarter of 2014; non-GAAP diluted EPS of $0.54, a 27% decrease compared to $0.74 in the prior year quarter; and free cash flow of $30.1 million, a 39% decrease compared to the prior year quarter.  Additionally, the Company reported equity earnings on joint ventures of approximately $3.2 million.

88.     Despite reporting disappointing Q1 results, the Company maintained its revenue, non-GAAP diluted EPS and free cash flow guidance for full-year 2015.

89.     On May 8, 2015, Iconix filed its Quarterly Report on Form 10-Q for the 2015 fiscal first quarter.  The Company's Form 10-Q was signed by defendants Cole and Blumberg, and reaffirmed the Company's April 29, 2015 statements.  The Form 10-Q also contained certifications signed by defendants Cole and Blumberg pursuant to SOX substantially similar in all material respects to those set forth in ¶ 57, *supra*.

**The Full Truth Regarding Iconix's Questionable Accounting Practices Is Revealed**

90.     On August 6, 2015, after the close of the trading session, the Company announced in a press release that its founder and CEO, defendant Cole, had resigned effective immediately. According to the press release, Cole served as the Company's CEO, Chairman, and President since he founded Iconix in 2005.

91.     On this news, Iconix shares declined $4.68 per share, or nearly 24%, to close at $14.92 per share on August 7, 2015.

92.     Finally, on August 10, 2015, prior to the open of trading, Iconix released disappointing results for the second quarter ended June 30, 2015 and drastically cut its full year guidance.   Quarterly revenues missed consensus estimates by 14%, and quarterly earnings missed by 13%.   While licensing revenue for the second quarter was approximately $98.5 million, a 1% increase as compared to approximately $97.5 million in the second quarter of 2014, the Company did not report any "Other revenue" in the quarter, as compared to

approximately $21.4 million of Other revenue recorded in the second quarter of 2014 related to the sale of the Sharper Image e-commerce business and a transaction related to its Southeast Asia joint venture.

93.     In connection with its results, Iconix also reported that the SEC had inquired about the Company's accounting for joint venture transactions.   In an accompanying press release, the Company disclosed that the SEC was reviewing its "accounting treatment for the formation of the Company's international joint ventures under U.S. Generally Accepted Accounting Principles and whether such joint ventures should potentially have been consolidated in the Company's historical results." Iconix also revealed that its Board had formed an independent committee to review this questionable accounting.   The Company warned that it may ultimately be forced to reverse certain gains it had recognized on its historical joint venture transactions and that the specific amounts that could be reversed as a result of improper accounting were estimated to be $46.5 million in 2014, $24.6 million in 2013, and $5.6 million in 2012.

94.     In reaction to these revelations, Iconix shares declined $0.35 per share, or 2.3%, to close at $14.57 per share on August 10, 2015.

95.     Contrary to the statements above, the Company had underreported the cost basis of the Licensing Rights to certain brands and had engaged in irregular accounting practices related to the booking of its joint venture revenues and profits, free-cash flow, and organic growth.

96.     As a result, the Company's earnings and revenues were overstated and the statements about the Company's business, operations, and future business prospects were materially false and misleading and/or lacked a reasonable basis.   Furthermore, Iconix's

securities traded at artificially inflated prices during the time period in which such false statements were issued.  However, as the truth about Iconix's accounting practices was gradually revealed to investors, the Company's share price declined dramatically.

97.    On November, 5, 2015, the Company filed a Form 8-K, reporting that its management team had determined, based in part on the Special Committee's review, that the Company would restate its historical financial statements for:  (i) the 2013 fiscal year and the fourth quarter thereof; (ii) the 2014 fiscal year and each quarterly period thereof; and (iii) the first and second quarters of 2015, to correct accounting errors.  According to the Form 8-K, the restatements include:  (i) the classification of contractually obligated expenses, retail support and other costs as selling, general and administrative expenses, as opposed to netting such expenses against licensing or other revenue, as applicable; (ii) inadequate support for revenue recognition relating to certain license agreements; and (iii) inadequate estimation of accruals related to retail support for certain license agreements.

98.    On November 25, 2015, the Company issued a Form 10-K/A to amend certain parts of its Annual Reports on Form 10-K for the years ended (i) December 31, 2013, originally filed with the SEC on February 27, 2014 and (ii) December 31, 2014, originally filed with the SEC on March 2, 2015.  Importantly, the Individual Defendants were forced to reveal that management had identified material weaknesses in the Company's internal controls over financial reporting as of December 31, 2014.  Moreover, the Company's outside auditors restated their report on the Company's internal control over financial reporting and issued an adverse opinion.

99.    A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation

of financial statements for external purposes in accordance with generally accepted accounting principles.  A company's internal control over financial reporting includes those policies and procedures that:  (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with GAAP and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

100.    According to the restated audit report, a material weakness existed regarding management's failure to timely and adequately perform management review control functions which material weakness created a reasonable possibility that a material misstatement of the company's annual or interim financial statements would not be prevented or detected on a timely basis.

101.    On November 27, 2015, the Company also filed Forms 10-Q/A to amend certain parts of its Quarterly Report on Form 10-Q for the quarter ended March 31, 2015, originally filed with the SEC on May 8, 2015, and to restate the Company's unaudited consolidated financial statements and related footnote disclosures as of June 30, 2015 and for the six month period ended June 30, 2015.

102.    The restatements decreased net income attributable to Iconix by approximately $3.9 million for the 2014 fiscal year.

103.    On December 28, 2015, the Company filed a Current Report on Form 8-K revealing that the Company had received a formal order of investigation from the Staff of the SEC.

## DAMAGES TO ICONIX

104.    As a result of the Individual Defendants' wrongful conduct, Iconix disseminated false and misleading statements and omitted material information to make such statements not false and misleading when made.  The improper statements have devastated Iconix's credibility. Iconix has been, and will continue to be, severely damaged by the Individual Defendants' misconduct.

105.    Indeed, the Individual Defendants misdeeds have subjected Iconix to multiple lawsuits for violations of the federal securities laws, including:  *Gene Niksich v. Iconix Brand Group, Inc.*, Case No. 1:15-cv-04860-PGG (S.D.N.Y.); *Lorenzo Lazaro v. Iconix Brand Group, Inc.*, Case No. 1:15-cv-4981-PGG (S.D.N.Y.); and *Haverhill Retirement System v. Iconix Brand Group, Inc.*, Case No. 1:15-cv-06658-PGG (S.D.N.Y.).

106.    As a direct and proximate result of the Individual Defendants' actions as alleged herein, Iconix's market capitalization has been substantially damaged.

107.    Moreover, these actions have irreparably damaged Iconix's corporate image and goodwill.  For at least the foreseeable future, Iconix will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Iconix's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

108.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as if fully set forth herein.

109.    Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress the Individual Defendants' breaches of fiduciary duties.

110.    Plaintiff is an owner of Iconix common stock and was an owner of Iconix common stock at all times relevant hereto.

111.    Plaintiff will fairly and adequately represent the interests of the Company and its stockholders in enforcing and prosecuting its rights.

112.    At the time this action was commenced, the Board consisted of six directors: defendants Cuneo, Emanuel, Cohen, Friedman, Marcum and Gove.

113.    As a result of the facts set forth herein, Plaintiff has not made any demand on the Board to institute this action against the Individual Defendants.  Such a demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

114.    The directors breached their fiduciary duties and face a disabling substantial likelihood of liability for causing Iconix to make false and misleading statements and engaging in a scheme to deceive the market in a course of conduct that artificially inflated the prices of Iconix common stock.  In particular, the Board caused or allowed the Company to misrepresent the value and prospects for the Company's business, growth prospects, and accounting compliance.

115.    In addition, defendants Cuneo, Cohen, Marcum and Gove served on the Audit Committee during the relevant time period and approved the improper statements pursuant to their duties and responsibilities as set forth above.  These defendants also failed to ensure the Company possessed necessary internal controls.  The abdication of their fiduciary duties as

members of the Board and Audit Committee further subject these defendants to a substantial likelihood of liability rendering demand futile.

116.    Each member of the Board is also disabled from considering a demand because of the remuneration they receive for serving on the Board

117.    Moreover, defendant Cuneo lacks independence by virtue of his role as CEO of the Company.

118.    Plaintiff has not made a demand on the other stockholders of Iconix to institute this action because such demand would be a futile act for at least the following reasons:  (a) Iconix is a publicly held company with 47 million shares outstanding and thousands of stockholders; (b) making demand on such a number of stockholders would be impossible for Plaintiff who has no way of determining the names, addresses or phone numbers of the stockholders; and (c) making demand on all stockholders would force Plaintiff to incur excessive expenses, assuming all stockholders could be individually identified.

## COUNT I

### Against the Individual Defendants for Breach of Fiduciary Duty

119.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as if fully set forth herein.

120.    The Individual Defendants each owe and owed Iconix and its stockholders the fiduciary duties of loyalty, good faith, candor and due care in managing and administering the Company's affairs.

121.    The Individual Defendants were required to exercise reasonable and prudent supervision over the management, practices, controls, and financial affairs of Iconix.

122.    The Individual Defendants breached their fiduciary duties owed to Iconix and its stockholders by willfully, recklessly, and/or intentionally failing to perform their fiduciary

duties.  They failed to properly oversee Iconix's business, rendering them personally liable to the Company.

123.    Each of the Individual Defendants had actual or constructive knowledge that the Company made the false statement specified above.

124.    As a direct and proximate result of the Defendants' breaches of fiduciary duties of loyalty, good faith, candor and due care as alleged herein, Iconix has sustained, and continues to sustain, significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

125.    Plaintiff, on behalf of Iconix, has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

A.      Declaring that Plaintiff may maintain this derivative action on behalf of Iconix and that Plaintiff is a proper and adequate representative of the Company;

B.      Awarding the amount of damages suffered by the Company as a result of the Individual Defendants' breaches of fiduciary duties;

C.      Granting appropriate equitable relief to remedy the Individual Defendants' breaches of fiduciary duties and other violations of law, including, but not limited to, the institution of appropriate corporate governance measures;

D.      Awarding plaintiff's reasonable costs and attorneys' fees; and

E.      Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: March 24, 2016

**BRAGAR EAGEL & SQUIRE P.C.**

*/s/ Todd H. Henderson*
J. Brandon Walker
Todd H. Henderson

Beth A. Keller
**HYNES KELLER & HERNANDEZ, LLC**
100 S. Bedford Road, Ste. 340
Mount Kisco, New York 10514
Tel: 914-752-3040
Fax: 914-752-3041
bkeller@hkh-lawfirm.com

885 Third Avenue, Suite 3040
New York, NY 10022
Tel: 212-308-5858
Fax: 212-214-0506
walker@bespc.com
henderson@bespc.com

Robert V. Prongay
**GLANCY PRONGAY & MURRAY LLP**
1925 Century Park East, Suite 20100
Los Angeles, CA 90067
Tel.: 310-201-9150
Fax: 310-432-1495
RProngay@glancylaw.com

DocuSign Envelope ID: FF093FE1-A08B-4731-80E1-3E86E5959321

## <u>VERIFICATION</u>

I, Patricia James, hereby declare, under penalty of perjury, as follows:

1.      My name is Patricia James and I am the plaintiff in the above-captioned stockholder derivative action.  I have read the foregoing verified stockholder derivative complaint (the "Complaint") and authorized its filing.  Based upon the investigation of my counsel, the allegations in the Complaint are true to the best of my knowledge, information, and belief.

2.      I am committed to and hereby declare my intent to fairly and adequately represent the interests of Iconix Brand Group, Inc. and its stockholders in this action.

DATED: March 21, 2016, 2016

DocuSigned by:

*Patricia James*

C0841889F4CE4D8...

Patricia James